Filed 2/14/24  Valdovinos v. Valdovinos CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| DIANA VALDOVINOS, | B322636 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. 21STRO07137) |
| ISRAEL VALDOVINOS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Amy M. Pellman, Judge.  Affirmed.

Gutierrez Law Firm and James P. Gutierrez for Plaintiff and Respondent.

Ahrony Appeals Law Group and Orly Ahrony for Defendant and Appellant.

_____

# INTRODUCTION

Israel Valdovinos appeals from a three-year domestic violence restraining order issued against him protecting his sister, Diana Valdovinos, and their mother, Eneyda Valdovinos.[1] Israel contends substantial evidence does not support the restraining order and the trial court denied him due process by excluding evidence about Diana's motive in seeking a restraining order, erred in denying his motion to dismiss, and engaged in judicial misconduct.  We affirm because substantial evidence supports the restraining order, and the trial court did not otherwise err.

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *Diana's Petition and Supplemental Declarations*

Israel and Diana are siblings.  Israel lives in Aurora, Colorado, which has been his primary residence since 1998.  He has no intention of moving back to Los Angeles.  Israel visits Los Angeles to see their mother, Eneyda, who at the time of Diana's request for a domestic violence restraining order (DVRO) was 85 years old and suffering from dementia.  Diana has been Eneyda's caretaker since late 2020.  Eneyda and Diana live on the same property and at least part of the time in the same three-bedroom unit, which is the family home where Israel and Diana grew up.  A roommate, Leonel Garcia, also lives in Eneyda's unit. Diana otherwise lives in a smaller unit approximately 20 feet

---

[1]    We refer to the parties' first names to avoid confusion given they share the same last name.

away from Eneyda's unit (the side unit).  Diana has lived on the property her whole life.  The property, a 10-unit building, is in a trust established by Eneyda, of which Israel and Diana are beneficiaries.

On November 15, 2021 Israel and his girlfriend showed up unannounced to Eneyda's home.  Diana and Israel had not spoken during the preceding year.  Diana had blocked Israel from her cell phone because she no longer wanted to receive text messages from him after he sent her disparaging messages and threatened to take control of the property and to force her out.  Israel moved into Eneyda's unit, effectively displacing Diana, and over the next several months, various confrontations between the siblings formed the basis for the DVRO at issue in this appeal.

Approximately one month after Israel arrived in Los Angeles, on December 20, 2021, Diana filed a Judicial Council form DV-100 for a DVRO against Israel, seeking both a stay-away order and a move-out order.  Diana described Israel's "ongoing" abuse, including his refusal to give Eneyda her daily medications; sending Diana "menacing messages"; calling her "'good for nothing'"; and taking a mattress from her room and placing it on top of her vehicle "sending the message to 'MOVE OUT.'"[2]  Diana described her injuries as "[e]motional [d]istress/[p]ossible homelessness."  Diana also described an incident on November 15, 2021 in which Israel "used his person to push me."  Diana attached, among other things, photos of

---

[2]    At the hearing for the DVRO, Diana conceded on cross-examination that the mattress Israel placed on top of her car was not taken from her bedroom; rather, the mattress was already outside by her car.

3

bruises on her arm and of an incident between herself and Israel inside of Eneyda's unit, which appeared to show Eneyda and an unidentified woman trying to stop the altercation.[3] The form was signed by Diana and her counsel, though both signatures appeared to be the signed initials of her counsel, "J.G."

On December 21, 2021 the trial court granted Diana a temporary restraining order, including personal conduct and stay-away orders. The court set a hearing for January 11, 2022, which was continued to February 3, 2022. On February 3, the court granted Diana's requests to amend the temporary restraining order to add Eneyda as a protected person and to grant a move-out order.

In February and April 2022, Diana filed supplemental declarations signed under penalty of perjury in support of a permanent restraining order. Diana explained that when she arrived on February 11 to serve Israel with the move-out order, he refused to grant her access to the property. When she drove in front of the property the next day, Israel followed her in his car while honking his horn and yelling at her. Diana disclosed that Israel had filed a petition for a conservatorship over Eneyda. Diana explained she had cameras installed on the property because she feared for her safety and attached evidence that the mailing addresses for herself and Eneyda had been changed to Israel's home in Colorado, including statements from the bank.

On June 3, 2022 Diana filed a witness list, an exhibit list, and a supplemental declaration signed under penalty of perjury.

---

[3]     Based on Diana's testimony at the hearing, it appears this photograph depicted an incident that took place on November 16, 2021, not November 15.

She filed an amended witness list and declaration on June 6. Diana stated that Israel had refused to give medication to Eneyda and that he "attempted to kill our mother by kicking me out and not allowing me to properly care for her." Israel, who was also represented by counsel, did not file any written responses or pre-hearing documents.

B.  *June 7, 2022 Hearing and DVRO*
    1.  *Diana's testimony*

Diana testified in person. She explained that she took care of Eneyda and helped manage the 10-unit building where she and Eneyda resided, for which she paid Diana $1,000 per month. On November 15, 2021 Israel and his girlfriend arrived at Eneyda's home. When Diana arrived home, she went upstairs. Diana's cousin from Nicaragua called, explaining that his mother was trying to reach Eneyda. Diana went downstairs to give Eneyda her cellphone. When she attempted to hand Eneyda the cellphone, Israel tried to snatch it from her hands. Diana began walking backwards when Israel pushed her, and she fell to the floor. Israel picked her up by the back of her sweater and threw her against a table, telling her to get out of the house and that it was his house. Eneyda was next to Diana when this happened. A neighbor called the police after hearing Diana's screams. The police arrived and instructed Israel to leave. No arrest was made. Diana went to her side unit because she did not feel safe. Diana submitted pictures taken on November 17 showing bruises on her arms she testified were caused by Israel.

When Diana returned the next afternoon to give Eneyda her lunch and medication, Israel grabbed Diana's arm, "wrapped it around a post" and used his body to press on her arm, causing

5

Diana to tear a ligament in her thumb. Israel's girlfriend and Garcia also were present. Garcia took photos of the incident, which the trial court admitted into evidence. Hearing Diana's screams, a neighbor called the police. The police arrived, but no arrests were made.

After this incident, Diana retreated to the side unit and would go to Eneyda's unit only when Israel was not there. This went on until approximately mid-December 2021, when Diana left the property to stay at a friend's house. Diana, accompanied by the police, returned to the property on December 29, 2021. She was able to use her key to unlock the door to Eneyda's unit. Israel came outside, began arguing with the police, and asked them to leave. Diana decided to leave. She returned with the police the next day, but she was unable to open the door to the home because Israel had changed the locks. Once Diana was able to get inside, she observed the bedroom doors had been removed and the front door had been boarded up. Diana found Eneyda, and they left the unit together.

In mid-February 2022 Diana and the police showed up to serve Israel with the move-out order. Later, when Diana returned to move back into the property, she pulled up to the property when Israel "came out of nowhere" in his car. Diana drove to the corner, and at the stop sign she observed "a white car behind me that started honking the horn really fast." Diana made a right turn and Israel followed, pulling up next to her car and "yelling and cussing" at her. Diana drove to the police station, where she had a panic attack. She was informed that the police were at the property, so she returned to the property. Israel was not there. To enter the property, the police had to break in through a window. The unit was not in livable condition

because there were electrical wires hanging from the ceiling, no light in Eneyda's bedroom, and the front door remained boarded up. Diana and Eneyda moved back into the property in late February. By that time, they had been living in hotels for approximately two months.

  2.  *Exclusion of Diana's financial motives*

On cross-examination, Israel's counsel attempted to ask Diana about the last time she worked outside the home. Before counsel could finish asking the question, the trial court cut her off stating, "Completely irrelevant." Counsel explained it went to "financial motive," to which the court responded, "No. This is a restraining order, counsel." The court went on to say, "So your client who did not file a response is now bringing up issues of financial. Okay. What he needs to do is he needs to respond to these allegations of assault and harassment. So a financial reason for assault and harassment is not going to help this court make a decision." Counsel attempted to explain that it was "not a financial reason for harassment" and that Diana "has a significant financial interest in the estate property. So it goes to—"; the court again cut off counsel and stated, "Irrelevant. So go on."

Israel's counsel also tried to explain that the California Rules of Court did not require Israel to file a written response to Diana's request for a DVRO. The trial court clarified, "I'm not saying that he doesn't [*sic*] have to, okay, but usually, counsel, when people have counsel, they file a response so that the other counsel knows what their response is, and the court knows." Israel's counsel responded, "Your Honor, you're not saying that he has to, but you've already indicated several times that you

7

would be limiting his testimony."[4]  The court explained, "I didn't say I was limiting his testimony.  I said I might limit other witnesses's [*sic*] testimony just like I would limit petitioner's testimony if I don't find those witnesses relevant.  I'm treating your client exactly the same as I'm going to treat the petitioner here."

3.      *Denial of Israel's motion to dismiss*

On cross-examination, Diana testified that she had never read the DV-100 form, it was not her signature on the form, she had no recollection of anybody reading the petition to her, and she did not give her attorney authorization to sign the form on her behalf.  Israel's counsel moved to dismiss on this basis. Diana's counsel conceded that there were "some errors" on the form, but that Diana's testimony was mostly consistent with the information contained on the form and in her supporting declarations.  The trial court denied the motion finding most of Diana's testimony had been consistent with her form and

---

[4]      At the beginning of the hearing, the trial court commented to Israel's counsel, "You did not file a response.  So the court can very much limit your response.  Maybe there will be a restraining order against you; maybe there won't be."  After Israel's counsel disclosed two witnesses, Israel and his girlfriend, the court remarked, "Well, I don't know if I'm going to allow your witnesses and whether or not they are percipient witnesses or not."  The court then chastised Israel's counsel for failing to file a written response or any prehearing documents.  With regard to Diana's proposed witnesses, which included Israel's two daughters, the court indicated its doubt that their testimony would be relevant. The court ultimately received extensive testimony from Diana and Israel, and no other witnesses.

declarations, and that although "petitioner does not remember signing the document . . . that doesn't necessarily mean that a restraining order should not be granted." Israel's counsel clarified that Diana's testimony was not that she could not remember, but that she neither signed the form nor authorized her attorney to sign on her behalf.

The trial court followed up with a series of questions posed to Diana about whether she wanted her attorney to file a restraining order on her behalf, whether she asked her attorney to do that for her, whether she paid her attorney to file the paperwork, and whether she was telling the truth. Diana responded yes to all the questions. However, the court then asked Diana if anyone ever asked her if it was okay if they signed her name, and she stated, "No one ever asked me if they could sign my name." She also responded "no" when the court asked her if she would be okay with her attorney signing her name. The court then asked Diana if she wanted to withdraw her request for a restraining order, to which Diana responded, "No." The court suggested Diana confer with her attorney "[b]ecause I certainly get the sense that you're not understanding everything." After consulting with her attorney, Diana testified that she authorized her attorney to sign on her behalf and that she trusted him. Diana also explained she did not understand what Israel's counsel was asking her regarding the form.

4.    *Israel's testimony*

Israel testified remotely by video. On November 15, 2021 Israel was having a conversation with Eneyda when Diana, without greeting him, rudely interrupted their conversation. Diana "started going into this weird panic mode," and Israel told

her, "Grow the fuck up and go upstairs." He was angry with her because she had interrupted him. Israel denied pushing Diana or grabbing her by her sweater. When the police arrived, they told Diana to go to her unit and to advise Israel when she would be coming over to tend to Eneyda's medication and food, rather than "just open the door and enter at will."

The next day, Diana entered Eneyda's unit, and Israel told her to get out of his sight and repeated more than 30 times to "please leave." Diana attempted to come further inside the unit, and Israel used his body to try to block her from entering. Israel denied placing his hands on Diana. Israel explained the bruise on Diana's arm was from Eneyda grabbing her and pulling her back.

Israel denied the mid-February 2022 incident that Diana testified about regarding Israel chasing her in her car. He explained the incident could not have happened because his vehicle was not operational the week of February 11. The alternator was replaced over Super Bowl weekend and returned to him on Monday, February 14.

Israel submitted into evidence a video he recorded on November 16, 2021 in which he repeatedly asked Diana to leave Eneyda's unit, and a set of text messages he sent to Diana while visiting Los Angeles relating to Eneyda's care. While he was visiting Los Angeles, he took Eneyda to the doctor, gave her medication, and bought her groceries. Israel explained the front door was boarded up because Diana and three others forced entry into the unit on December 29, 2021. He changed the locks because Diana had opened the door twice the day before, including with the police, and Israel did not like that Diana allowed the police to enter the unit. Israel also believed that

Diana did not live in Eneyda's unit and that Diana's actual home was the side unit next door.

Regarding text messages from the last several years, Israel could not recall the content of the text messages. Israel denied submitting any mail forwarding request on behalf of Eneyda, only for himself.

5.     *The trial court's ruling*

The trial court granted a three-year DVRO protecting Diana and Eneyda. The court found Diana's testimony to be "credible and consistent in the important allegations," including that Israel assaulted her on November 15 and 16, 2021 and followed Diana in his car in mid-February 2022. The court also found that Israel had disturbed Diana's peace with his harassing telephoning, emailing, and texting. In contrast, the court found Israel's testimony "very vague and evasive," and he gave details "when it suited him . . . [and] when it didn't suit him, he seemed to forget." The court observed that Israel was a visitor, and that he had no right to be in Eneyda's home. As to Eneyda, the court found she was at a risk of harm because Israel kept Eneyda from Diana even though he did not know how to take care of Eneyda. The DVRO included a no-contact order and a stay-away order as to Diana and Eneyda, but allowed Israel monitored phone calls with Eneyda on Sunday evenings and four monitored visits, up to four hours for each visit, when Israel was in town.

**DISCUSSION**

A.     *Governing Law and Standard of Review*

The Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6200 et seq.)[5] prevents "acts of domestic violence, abuse, and sexual abuse" and "provide[s] for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220; *Curcio v. Pels* (2020) 47 Cal.App.5th 1, 11 (*Curcio*); accord, *In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 225.)  "Abuse" includes "intentionally or recklessly caus[ing] or attempt[ing] to cause bodily injury," "plac[ing] a person in reasonable apprehension of imminent serious bodily injury to that person or to another," and "engag[ing] in any behavior that has been or could be enjoined pursuant to Section 6320."  (§ 6203, subd. (a); § 6320, subd. (a) [enjoining a party from "disturbing the peace of the other party"].)

The petitioner bears the burden of showing by a preponderance of evidence "'"reasonable proof of a past act or acts of abuse."'"  (*Curcio, supra,* 47 Cal.App.5th at p. 11.)  Upon such a showing, a trial court can issue a DVRO prohibiting an individual from "attacking, striking, stalking, threatening, . . . battering, . . . harassing, telephoning, . . . destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party."  (§§ 6300; 6320, subd. (a).)  "'[D]isturbing the peace of the other party'" includes direct and

---

[5]     All further undesignated statutory references are to the Family Code.

12

indirect methods of "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (§ 6320, subd. (c) [methods include "telephone, online accounts, text messages, internet-connected devices, or other electronic technologies"].)

A trial court may issue a DVRO after notice and a hearing based on "an affidavit or testimony and any additional information provided." (§§ 6300, subd. (a); 6340, subd. (a)(1); *In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 117 ["a trial court should, of course, hear and evaluate the evidence relating to incidents set forth in a petitioner's request"].) "The DVPA 'confer[s] a discretion designed to be exercised liberally, at least more liberally than a trial court's discretion to restrain civil harassment generally.'" (*Curcio, supra,* 47 Cal.App.5th at p. 11.) Other named family or household members may be added as protected persons in the DVRO for "good cause." (§ 6320, subd. (a); see *M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1144 ["showing or finding of potential jeopardy to the safety or well-being of the children is not a necessary predicate for including them as protected parties; it is but one factor the court must consider in the totality of the circumstances"].)

"We review the grant of a DVPA restraining order for abuse of discretion, and, to the extent we are called upon to review the court's factual findings, we apply the substantial evidence standard of review. [Citation.] In reviewing the evidence, we examine the entire record to determine whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court's findings. [Citation.] We must accept as true all evidence supporting the trial court's findings, resolving every conflict in favor of the judgment. [Citation.] We do not

13

determine credibility or reweigh the evidence. [Citation.] If substantial evidence supports the judgment, reversal is not warranted even if facts exist that would support a contrary finding." (*Curcio, supra,* 47 Cal.App.5th at p. 12; *In re Marriage of D.S. & A.S.* (2023) 87 Cal.App.5th 926, 933; *In re Marriage of Davila & Mejia, supra,* 29 Cal.App.5th at p. 226.) "'We independently review due process claims "because 'the ultimate determination of procedural fairness amounts to a question of law.'"'" (*In re Marriage of D.S. & A.S.,* at p. 933.)

B.       *Motion To Strike Diana's Respondent's Brief*

Israel moved to strike Diana's respondent's brief for failing to include citations to the appellate record in violation of California Rules of Court, rule 8.204, and for failing to address the arguments raised in Israel's opening brief. We deferred ruling on his motion until we decided the appeal. Israel's motion to strike is denied. Although Diana's two-page respondent's brief failed to cite to the appellate record, we exercise our discretion to disregard her noncompliance. (Cal. Rules of Court, rule 8.204(e)(2)(C).) We note that even if Diana had failed to file a brief, "'we do not treat the failure to file a respondent's brief as a "default" (i.e., an admission of error) but independently examine the record and reverse only if prejudicial error is found.'" (*In re Marriage of Rifkin & Carty* (2015) 234 Cal.App.4th 1339, 1342, fn. 1; see Cal. Rules of Court, rule 8.220(a)(2) [in the absence of a respondent's brief, "the court may decide the appeal on the record, the opening brief, and any oral argument by the appellant"].)

14

C. *Substantial Evidence Supports the Trial Court's Order Granting Diana's Request for a DVRO*

Israel argues substantial evidence does not support the DVRO protecting Diana because she testified inconsistently regarding the DV-100 form and because the trial court should not have credited her testimony. Israel further argues Eneyda should not have been added as a protected party because she did not testify and because there was no evidence of abuse against her as defined in section 6320.

Israel does not cite any authority supporting his position that a protected person's inconsistent statements require reversal of a DVRO. Israel's argument is contrary to established standards of review for substantial evidence, which require us to accept as true all evidence—contradicted and uncontradicted—that supports the trial court's findings and to resolve any conflicts in favor of the judgment. (See *Curcio, supra,* 47 Cal.App.5th at p. 12.) Likewise, Israel's argument that the trial court erred in crediting Diana's testimony over his testimony fails because we do not reweigh the trial court's credibility findings on appeal. (*Ibid.*; see *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043 ["[a] trier of fact is free to disbelieve a witness . . . if there is any rational ground for doing so"]; Evid. Code, § 780 [in determining the credibility of a witness, the court may consider, among other things, the "demeanor while testifying and the manner in which" a witness testifies].)

Further, as to Eneyda, Israel misapprehends the standard for adding a family or household member as a protected party to a DVRO. Section 6320, subdivision (a), by its express language, only requires a showing of "good cause" for the inclusion of family or household members in a DVRO. A trial court determines

15

whether good cause exists based on a totality of circumstances of which finding risk of well-being of the added member is one factor. (*M.S. v. A.S., supra,* 76 Cal.App.5th at p. 1144.) Contrary to Israel's argument, the good cause standard does not require showing that Israel directly abused Eneyda.

The Legislature designed the DVPA "'to be exercised liberally,'" which is reflected by the statute's relatively low standard of proof that requires only "'reasonable proof'" of at least one past act of abuse. (*Curcio, supra,* 47 Cal.App.5th at p. 11; see *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334 [explaining the liberality under the DVPA compared to a civil harassment restraining order, including the standard of proof required].) Substantial evidence supports the trial court's finding that Israel physically injured Diana on November 15 and 16, 2021. Diana testified that Israel pushed her down and threw her against a table. She further testified that Israel wrapped her arm around a post and used his body to lean against her, causing her to tear a ligament in her thumb. One photograph shows Israel and Diana in a confrontation, with Eneyda and another woman appearing to break up the altercation. Another photograph shows bruising on Diana's arm, which she testified was caused by Israel on November 15. Diana's testimony and the photograph are "reasonable proof" that Israel intentionally or recklessly caused her bodily injury or placed her in "reasonable apprehension of imminent serious bodily injury."

Substantial evidence also supports the trial court's finding that Israel disturbed Diana's "mental or emotional calm." (§ 6320, subd. (c).) Notwithstanding the fact that Diana lived at least part time in Eneyda's unit and served as Eneyda's caretaker since late 2020, Israel showed up to Los Angeles unannounced,

16

proceeded to move into Eneyda's unit ostensibly without anyone's permission, and changed the locks on the door because he was angry with Diana for letting herself into the unit, including with the police, without giving him any notice. Israel's conduct caused Diana to leave the property—where she had lived her whole life—for approximately two months. Other evidence, such as the incident in mid-February 2022 when Israel followed Diana in his vehicle and the changing of Diana's mailing address to Israel's home in Colorado, also supports the court's finding that Israel disturbed Diana's peace of mind.

Further, there was good cause to include Eneyda in the DVRO. She was in her mid-80's, suffered from dementia, and required care, which Diana provided. Eneyda and Diana lived together at least part of the time. Eneyda was present and exposed to the altercation when Israel injured Diana's thumb, as well as to the altercation that occurred the day before. Like Diana, Eneyda stayed away from the property for approximately two months, living in hotels, while Diana secured a move-out order against Israel. Eneyda's mail was forwarded to Israel's home in Colorado, which could be interpreted as Israel improperly trying to exert control over Eneyda. Given the totality of the circumstances, good cause existed to include Eneyda in the DVRO.

D.     *The Trial Court Did Not Otherwise Err in Its Rulings or Conduct During the Hearing*
       1.     *Israel was not denied due process during the hearing*
       Israel argues the trial court violated his due process rights by not allowing him to introduce evidence about Diana's "financial motives," which he describes as evidence from the

17

conservatorship proceedings, in which Israel was trying to remove Diana as trustee, including evidence of Diana's alleged breach of fiduciary duties relating to the trust and property management.[6] Israel claims the excluded evidence would have shown Diana's improper retaliatory motive in seeking a DVRO and was relevant to her credibility. Israel's argument is not persuasive.

Israel relies primarily on *In re Marriage of D.S. & A.S., supra,* 87 Cal.App.5th 926, in support of his argument. In *D.S. & A.S.* the trial court granted a request for a DVRO without receiving any testimony. Having failed to make any effort to determine the credibility of the parties, the court of appeal concluded it was "not possible that the court could reasonably have made any credibility determinations or resolved material factual disputes based solely on the pleadings alone." (*Id.* at p. 936.)

We do not have such a situation here because the trial court allowed extensive testimony and cross-examination of Diana and Israel. Although the court expressed dismay that Israel, given he was represented by counsel, failed to file a written response to Diana's request for a DVRO, the court clarified it was not limiting Israel's testimony any differently

---

[6] In his opening brief, Israel includes references to evidence from the conservatorship proceedings. We previously denied Israel's motion to augment the appellate record and his request for judicial notice. Diana's respondent's brief also includes statements of matters outside the trial record. We do not consider any evidence that was not before the trial court. (See *DVI, Inc. v. Superior Court* (2002) 104 Cal.App.4th 1080, 1090-1091.)

than Diana's testimony, and the court would exclude any testimony or witnesses that was not relevant to the proceeding. Israel was not deprived of due process under these circumstances. Additionally, we observe there was already evidence before the trial court relating to Diana's "financial motives," including her February 2022 declaration where she explained Israel had initiated conservatorship proceedings and in her testimony that Eneyda paid her $1,000 per month to help with property management.

At oral argument, Israel's counsel argued Diana's alleged motives were "outcome determinative" regarding her credibility. We are unpersuaded in light of the extensive testimony provided by both parties during the hearing. The record contains sufficient evidence to support the trial court's credibility findings.

Further, the court's exclusion of evidence was an evidentiary ruling, which we review for an abuse of discretion and is not cause for reversal absent a miscarriage of justice. (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.) The court did not abuse its discretion and there was no miscarriage of justice because even if Diana harbored an improper motive in seeking a DVRO, such motive would not negate otherwise credible evidence of abuse to support a DVRO. (Cf. *Michael M. v. Robin J.* (2023) 92 Cal.App.5th 170, 182 ["[T]he mere existence of a retaliatory motive still would not negate the compelling evidence that Robin had a reasonable basis to fear Michael."].) In all events, the record contains compelling evidence supporting the DVRO: Israel arrived in Los Angeles unannounced and engaged in two altercations with Diana, caused Diana and Eneyda to be displaced from their home for at least two months, and changed the locks so that Diana could not access

19

Eneyda's unit.  Under these circumstances, any error in excluding additional evidence about Diana's alleged motives is harmless, and the exclusion of evidence did not result in prejudicial error.

2.  *The trial court did not err in denying Israel's motion to dismiss Diana's request for a DVRO*

Israel argues "a request for a domestic violence restraining order must be verified and signed under the penalty of perjury," so the trial court should have granted his motion to dismiss because Diana initially testified that she did not sign the DV-100 form or authorize her attorney to sign on her behalf.

Although Diana testified multiple times that she did not sign the DV-100 form or give her attorney permission to sign it on her behalf, the trial court observed that Diana appeared confused by the questions.  After consulting with her attorney, Diana testified that she did authorize her attorney to sign her name.  The court also posed questions to Diana to confirm that she intended to request a DVRO and wanted her attorney to file the request on her behalf.  The court credited Diana's subsequent testimony, a decision we do not question on appeal.

Even assuming Diana had not authorized her signature, a DVRO can be based on "an affidavit or testimony and any additional information provided."  (§ 6300, subd. (a).)  If Diana's DV-100 form was defective in some way, her testimony under oath at the hearing comprises substantial evidence supporting the DVRO.  Diana also submitted three declarations signed under penalty of perjury leading up to the hearing.  Israel does not cite any authority that, notwithstanding testimony under

oath and declarations signed under penalty of perjury, a defective DV-100 form precludes the issuance of a DVRO.

3.    *The trial court did not become an advocate for Diana*

Related to the trial court's ruling on his motion to dismiss, Israel argues the court was biased against him and improperly advocated on Diana's behalf. Israel specifically takes issue with the court's prefatory statements about witnesses and testimony, and the court's examination of Diana about the DV-100 form.

As Israel acknowledges, failure to object to judicial misconduct in the trial court results in forfeiture of the argument on appeal. (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237 ["As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial."]; *People v. Harris* (2005) 37 Cal.4th 310, 350 [failure to object at trial forfeited defendant's argument that the trial court "overstepped its bounds with respect to the tone, form, and number of questions posed"]; *People v. Corrigan* (1957) 48 Cal.2d 551, 556 ["It is settled that a judge's examination of a witness may not be assigned as error on appeal where no objection was made when the questioning occurred."].) Although Israel contends any objection would have been futile, he fails to explain persuasively why that is so under the circumstances presented. Further, the authority he cites is inapposite and fails to support his contention. (See, e.g., *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 648 [addressing waiver of errors on voir dire]; *People v. Flores* (1971) 17 Cal.App.3d 579, 587 [holding "an expression of a defendant's guilt" by the court during a jury trial is "prejudicial as a matter of law"].)

21

By contrast, the record before us suggests that any objection to alleged judicial misconduct would not have been futile. For example, after the trial court noted Israel's failure to file a response on several occasions and stated it would limit Israel's testimony, his counsel raised the point that Israel was not required to file a written response. The court clarified it was not limiting Israel's testimony and that it would treat the parties equally in excluding irrelevant testimony. Israel has not shown that had he objected to concerns he had about perceived judicial bias, including the court's questioning of Diana about the DV-100 form, that his objection would have been futile.

Israel's argument also fails on the merits. Evidence Code section 775 authorizes a trial court to examine witnesses, including eliciting or clarifying testimony. "[T]he power to do so must be exercised impartially," and a trial court "must not become an advocate for either party or under the guide [*sic*] of examining witnesses." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1305, overruled on another ground in *People v. Merritt* (2017) 2 Cal.5th 819, 821-822.) Here, the court's questions sought to clarify what it believed to be Diana's misunderstanding about the DV-100 form. To be sure, Diana gave contradictory responses to the court's questions, but she confirmed that she desired, instructed, and paid her attorney to file a request for a DVRO. No prejudicial error occurred because, as discussed above, Diana's testimony under oath at the hearing and her declarations signed under penalty of perjury constitute substantial evidence to support the issuance of a DVRO.

22

## DISPOSITION

The DVRO is affirmed.  Diana shall recover her costs on appeal.


MARTINEZ, J.

We concur:



SEGAL, Acting P. J.



FEUER, J.